1
2
3
4                     UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    LY SABETH BUN,                          Case No.  17-cv-06418-EMC
8                    Plaintiff,
                                             **ORDER GRANTING DEFENDANTS'**
9           v.                               **MOTION FOR SUMMARY**
                                             **JUDGMENT**
10   CITY OF LIVERMORE, et al.,
                                             Docket No. 53
11                  Defendants.
12
13
14          Plaintiff Ly Sabeth Bun sued the City of Livermore, Livermore Police Officers Daniel

15   Tabak and Michael Busavec, Livermore Police Chief Michael Harris and unnamed Doe

16   Defendants for damages stemming an incident on November 2, 2015 during which Plaintiff was

17   struck in the head by a "less lethal" round fired by Tabak after Plaintiff refused to comply with

18   repeated orders to submit to arrest.  Docket No. 2 ("Compl.").  Plaintiff alleged two causes of

19   action under 42 U.S.C. § 1983: (1) excessive force in violation of the First and Fourteenth

20   Amendment and (2) *Monell* liability.  *See id.*  Now pending is Defendant's motion for summary

21   judgment as to all claims against all defendants.

22          For the following reasons, the Court **GRANTS** Defendants' motion in its entirety.

23                          **I.      BACKGROUND**

24   A.     Factual Background

25          The facts as summarized below are undisputed unless otherwise noted.

26          1.      CHP Encounters Plaintiff

27          On November 2, 2015, "Plaintiff was a hit-and-run suspect being pursued by CHP

28   [California Highway Patrol] and Livermore Police Department."  Docket No. 54, Exh. A

United States District Court
Northern District of California

United States District Court
Northern District of California

("Plaintiff's Civil Complaint Against Laura Welty") at 2.[1]  Additionally, Plaintiff "was suspected of driving a stolen vehicle under the influence of drugs and/or alcohol."  Compl. ¶ 17.  Plaintiff was driving a new black Mercedes sedan which had dealer plates rather than a typical valid California license plate which showed major damage to the body and wheels, including all four tires shredded and flat, such that the vehicle was no longer operable.  *See* Docket No. 55, Exh. A ("Bun Depo.") at 30:23-31:2, 32:12-13; 46:3-9, 50:18-24; Docket No. 63 at 61:13-13 (the vehicle had "significant damage to the front end, flat tires, and was actually missing the front left tire.").  Plaintiff does not recall how the car became damaged.  *Id.* at 39:2-40:13.  Plaintiff pulled over and stopped on the westbound shoulder of the I-580 highway near Livermore in the night of November 2, while it was dark and rainy, in order to call a tow truck because the damage to his car left it inoperable.  *Id.* at 30:23-31:2, 37:21-38:16.

A few minutes after Plaintiff pulled over to the shoulder of I-580, while Plaintiff was waiting for his phone to charge in order to call a tow truck, Plaintiff believes that several CHP officers arrived at his car.  Bun Depo. 58:22-61:10.  Plaintiff's car windows were tinted and rolled up, and the doors were locked.  *Id.* at 44:18-21, 59:18-60:8.  CHP Officer Eric Aguilar gave commands to Plaintiff using a public address system for Plaintiff to exit the vehicle with his hands up.  Docket No. 63 at 65:7-14.  Plaintiff does not recall hearing any commands given to him while he was inside of the car.  Bun Depo. at 58:2-25.  When Plaintiff did not respond to the commands, CHP officers attempted to break the vehicle's windows.  Docket No. 63 at 65-66.  Plaintiff feared that the officers were attempting to kill or rob him of his jewelry, motivated, in part, in Plaintiff's view, because Plaintiff asserts that he is a descendent of Cambodian royalty.  *Id.* at 60:13-61:10.  As the CHP officers broke Plaintiff's windows, Plaintiff crawled through the passenger side window, slid down an approximately 150-foot embankment on the side of the highway, and

---

[1] The Court grants Defendants' unopposed motion to take judicial notice of Plaintiff's civil complaint against percipient witness Laura Welty filed in the Superior Court of California, County of Alameda on August 10, 2018, Docket No. 54 ("RJN"), because it is a record of "proceedings in other courts, both within and without the federal judicial system" which has "a direct relation to matters at issue."  *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. Nov.2007) (quoting *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n. 2 (9th Cir. 2002).  Plaintiff does not dispute the accuracy or authenticity of the document.

entered a privately-owned property by climbing over a wired fence and "r[unning] for his life." Bun Depo. at 6:13-18, 65:16-24, 77:17-22, 79:5-6, 82:20-83:14.  When Plaintiff abandoned his vehicle, CHP officers advised him to stay on the ground, keep his hands out, not to move and to stay down, but Plaintiff did not comply and ran away from the officers.  Docket No. 63 at 66-67. Plaintiff summarized the events in a separately filed civil action as: "Plaintiff abandoned his vehicle in the vicinity of the Altamont Pass, and fled on foot entering the 'Club Moto' property. . . [P]laintiff repeatedly refused to obey commands by the police officer to stop and continued to flee."  Plaintiff's Civil Complaint Against Laura Welty at 2, 4.  After Plaintiff fled the car, CHP officers requested assistance from the Livermore Police Department.  Docket No. 59 ("Tabak Decl.") ¶ 4.

2.    Arrival of Livermore Police Officers

At approximately 6:30pm, Livermore Police Department officers Daniel Tabak, Michael Busavec and Jason Brock responded to a request for assistance from CHP in separate and marked patrol vehicles.  Tabak Decl. ¶¶ 2-5; Docket No. 56 ("Busavec Decl.") ¶ 3.  The officers responded to a dispatch command from the Livermore Police Department in response to a request by CHP for "assistance with an occupied stolen vehicle. . . on Interstate 580 near Greenville Road in [Livermore] city limits."  Docket No. 63, Exh. A ("Tabak Depo.") at 61:18-25.  CHP "requested emergency assistance because they had an uncooperative occupant in the vehicle." *Id.* As Tabak was en route to the location, he received additional updates that "the occupant in the vehicle had. . . fled on foot from the Highway Patrol officer," the individual had "run[] down an embankment" and "entered a property that was called Club Moto in Livermore," and the individual "was still being noncompliant, uncooperative." *Id.* at 62:8-63:5. The last report Tabak received while driving to the scene was that the suspect was running from officers on foot, and fleeing northbound from the highway.  Tabak Decl. ¶ 6. Tabak and Brock wore and activated body-worn cameras.  Tabak Decl., Exhs. C, D, E.

Tabak and Busavec arrived to the Club Moto property around the same time and both climbed a chain-linked fence to enter the property.  Tabak Decl. ¶ 8; Busavec Decl. ¶ 7.  The bodycam video footage indicates that the setting was dark, with no source of light other than

3

United States District Court
Northern District of California

1  flashlights used by other individuals at the scene.  *See* Exh. C ("Tabak Bodycam") at 9:15; Bun

2  Depo. at 82:1-83:8.  Shortly after entering the property, Officer Tabak states he spotted Plaintiff

3  lying on his stomach with his hands concealed under his body and out of sight.  Tabak Decl. ¶ 10.

4  The audio recording from the bodycam footage indicates that multiple officers repeatedly yelled at

5  Plaintiff to put his body flat on the ground, to make his hands visible, and to stop moving.  Tabak

6  Bodycam at 10:10-11:45.  Another officer at the scene, CHP Officer Harless, states that he saw

7  Plaintiff "lying on his stomach" where "he was moving his hands up and down" or in "a forward

8  motion."  Docket No. 63, Exh. B at 29:23-25.

9          3.      Tabak's Use of Force

10         Officer Busavec carried a "less-lethal launcher" issued by the Livermore Police

11  Department.  Busavec Decl. ¶ 8.  A less-lethal launcher resembles a shotgun, but deploys less-

12  lethal projectiles filled with cotton and weighted shot.  Docket No. 55, Exh. B ("Interrogatory

13  Responses") at 4.  The purpose of a less-lethal projectile is to gain "pain compliance" to de-

14  escalate a dangerous situation because the projectile is less likely to result in serious injury than a

15  standard firearm round.  Tabak Decl. ¶¶ 13-14.

16         Immediately after sighting Plaintiff, Busavec fell in the mud and broke his fibula.  Busavec

17  Decl. ¶ 11.  Tabak ensured Busavec was out of the harm's way and called for medical assistance.

18  Tabak Decl. ¶ 14.  Tabak then "took control" of Busavec's less-lethal launcher.  *Id.*; Tabak

19  Bodycam at 11:15.  As Tabak tended to Busavec, other officers on the scene continued to

20  command Plaintiff to comply.  Tabak Bodycam at 10:10-11:15.  By the time Tabak was done

21  tending to Busavec, Plaintiff had gotten up from his lying position, and continued to refuse to

22  comply with the commands of officers, and was walking away from officers.  Tabak Decl. ¶¶ 11-

23  16; Tabak Bodycam 11:15-12:30.  After approximately two and a half minutes of Plaintiff's

24  failure to comply with officer commands, Tabak can be heard on the bodycam footage stating, "I

25  am going to beanbag this guy."  Tabak Bodycam at 11:15.  The officers continued to issue

26  commands, including, "Show me your hands," "Get on the ground," "Get on the ground or you'll

27  get bean bagged," and "Dog is going to bite you."  Tabak Bodycam 8:40-13:00; Tabak Decl. ¶ 11.

28  CHP Officer Randy Adam Harless testified at a suppression hearing related to Plaintiff's criminal

proceedings that he also yelled "less lethal" multiple times at Plaintiff, but Plaintiff did not respond in any way.  Docket No. 63 at 87-89.  Plaintiff did not comply with the orders and remained standing, facing away from the officers.  Tabak Decl. ¶¶ 11, 15, 18.  Officer Tabak states that Plaintiff's hands were near his waistband at this time.  *Id.*

According to Officer Tabak, Tabak then aimed the less-lethal launcher from approximately 30-40 away at Plaintiff's left arm and attempted to deploy a round, but the weapon misfired twice and no projectile deployed.  *Id.* ¶¶ 18-19.  On Tabak's third attempt, the weapon discharged and a less-lethal round struck Plaintiff's upper left arm.  *Id.* ¶ 20.  Plaintiff fell to the ground and stopped briefly, but did not comply with commands to remain on the ground or show officers his hands.  *Id.* ¶ 21.  Plaintiff got up after being struck, and continued to walk away from the officers.  Docket No. 63 at 89-90.  Plaintiff walked into a fence and continued to defy the commands of officers not to move and to show his hands.  *Id.*  Plaintiff proceeded to pick up his pace and quickly walk away from the officers.  *Id.* at 91.  According to Officer Tabak, Plaintiff's arms remained by his waistband.  Tabak Decl. ¶ 21.  CHP Officer Harless states that around this time he and other officers continued to command Plaintiff to stop and put his hands up, but Plaintiff continued to not comply.  Docket No. 63, Exh. B at 34:12-16.

After Plaintiff was struck the first time and continued to walk away from officers, a female voice yelled, "He's got a gun."  Tabak Decl. ¶ 22; Busavec Decl. ¶ 13; Docket No. 55, Exh. D ("Brock Bodycam") at 1:05-1:20; Docket No. 63 at 87-88 ("[T]here was a citizen on the property who was yelling to us that they had a gun.  So that was a real fear that he had a gun."); Plaintiff's Civil Complaint Against Laura Welty at 2, 4 ("Plaintiff sustained a head injury when he was struck by a bean bag round fired by Livermore Police Officer after plaintiff repeatedly refused to obey commands by the police officer to stop and continued to flee.  Plaintiff alleges, inter alia, that [Laura Welty] yelled, 'He's got a gun,' prompting the police officer to fire the rounds.").  Tabak was not sure who made the statement at the time, but believed the statement referred to Plaintiff.  Tabak Decl. ¶ 22.[2]  Tabak fired a second less-lethal round at Plaintiff from 30-40 feet away.  *Id.* ¶

---

[2] It is undisputed that it was later discovered that the person who made the statement was Laura Welty, a percipient witness and resident on the property.

24.  It is not clear whether the second round struck Plaintiff, but in response to the discharge of the second round, Plaintiff began to run away from the officers.  *Id.* ¶ 25.  Thereafter, Tabak fired a third less-lethal round at Plaintiff, aiming at Plaintiff's back.  *Id.* ¶ 27.  The round, however, struck Plaintiff in the back of his head.  *Id.*  Plaintiff fell to the ground and was handcuffed.  *Id.*  The officers did not find a gun.  Plaintiff was transported to Valley Care Hospital.  Tabak Decl. ¶ 28.  Plaintiff suffered a cracked skull and traumatic brain injury.  Bun Depo. at 85:1-9.

Tabak stated at his deposition that Plaintiff never verbally threatened any officers, never physically threatened any officers, did not charge at officers, and consistently walked or ran away from officers, or otherwise stood still or prone on the ground.  *See* Tabak Depo. at 87:14-89:13.  Tabak also stated that he never saw a weapon and never witnessed Plaintiff point anything at him that resembled a weapon.  *Id.* at 87:14-19.

After the encounter, on February 19, 2016, Plaintiff was charged with misdemeanor offenses for driving under the influence, hit-and-run driving, and resisting arrest.  *See* Docket No. 54, Exh. B ("Crim. Complaint").  All charges were ultimately dismissed.  *See* Opp. at 14 n.1.

4.    Livermore Police Department Use of Force Policy

Livermore Police Department's written police permits officers to use reasonable force to effect and arrest, prevent escape or to overcome resistance.  Docket No. 57 ("Gouard Decl.") ¶ 14.  The Department maintains a policy manual with guidelines regarding the use of "Kinetic Energy Projectile[s]."  *See id.*, Exh. A, Policy 308.9.  The policy explains that such projectiles, "when used properly, are less likely to result in death or serious physical injury and can be used in an attempt to de-escalate a potentially deadly situation."  *Id.*  The police instructs officers that "circumstances appropriate for deployment include, but are not limited to, situation in which. . . the suspect is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions."  *Id.* § 308.9.1.  The policy, further explains, that "the need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death.  The head and neck should not be intentionally targeted, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others."  *Id.* § 308.9.2.  The guidelines include safety procedures regarding the use of such weapons:

> Shotguns specifically designated for use with kinetic energy projectiles will be specially marked in a manner that makes them readily identifiable as such. Officers will inspect the shotgun and projectiles at the beginning of each shift to ensure that the shotgun is in proper working order and the projectiles are of the approved type and appear to be free from defects.
>
> When it is not deployed, the shotgun will be unloaded and properly and securely stored in the vehicle. When deploying the kinetic energy projectile shotgun, the officer shall visually inspect the kinetic energy projectiles to ensure that conventional ammunition is not being loaded into the shotgun.

*Id.* § 308.9.3.

Officer Tabak received certification from the California Peace Officer Standards and Training ("POST") for his completion of police academy training, including restriction with regards to Department policies regarding the use of force. Gouard Decl. ¶ 9.

Plaintiff's expert witness, Rahn L. Carmichael, a retired police officer with 37 years of experience with the Richmond Police Department, during which he served as a Field Training Officer, Defensive Tactics Instructor and Force Options Instructor, declares that the use of a bean bag shotgun targeted in proximity to the neck and head does not align with accepted police standards. *See* Docket No. 65 ("Carmichael Decl.") ¶¶ 1-2, 11. Carmichael further declares that using a bean bag less-lethal launcher targeted at "vital parts of the body such as center mass chest areas are discouraged because of the proximity to vital organs and potential lethal injuries." *Id* ¶ 15. "This is not the intended use and is discouraged by the manufacturer and unauthorized by all POST mandated training." *Id.* Carmichael declares that that a bean bag launcher should be targeted at an "extremity target such as legs, arms and hands." *Id.* Carmichael further states that, in his opinion, "The skills necessary to properly and safely deploy [a bean bag launcher] must be practiced in real world scenarios quarterly" in order for an officer to "maintain proficiency with the weapon." *Id.* ¶ 21.

B.    Procedural History

Plaintiff filed his operative Complaint on November 2, 2017. Docket No. 2. Plaintiff alleged two counts pursuant to 42 U.S.C. § 1983: excessive force in violation of the First and Fourteenth Amendments and *Monell* liability. *Id.* Defendants answered on April 4, 2018. Docket

7

No. 17.  Now pending is Defendants' motion for summary judgment as to both counts.  Docket No. 53 ("MSJ").

## II.      STANDARD OF REVIEW

A.      Motion for Summary Judgment (Rule 56)

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  Id. at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  See id. at 255.[3]

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.      DISCUSSION

A.      Excessive Force: Fourth Amendment (Defendant Tabak)

Plaintiff's excessive force claim is based on Tabak's use of the less-lethal launcher. Plaintiff does not dispute that Tabak and the other officers had probable cause to arrest Plaintiff, and that the officers were attempting to effect the arrest of Plaintiff when Tabak used the less-lethal launcher.  Accordingly, the parties agree that the legal framework developed by the Supreme Court in Graham v. Connor applies.  490 U.S. 386 (1989).

---

[3] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form.  See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

United States District Court
Northern District of California

Under *Graham*, the use of force to effect an arrest is examined in light of the Fourth Amendment's prohibition on unreasonable seizures. *Id.* at 397; *Chew v. Gates,* 27 F.3d 1432, 1440 (1994). The officer's actions are measured by the standard of objective reasonableness. *Id.* "The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking into account that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 396-98. The reasonableness of the force used to effect a particular seizure, is determined by "careful[ly] balancing. . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "[T]he force which [i]s applied must be balanced against the need for that force." *Liston v. County of Riverside,* 120 F.3d 965, 976 (1997).

If the evidence, reviewed in the light most favorable to Plaintiff, could support a finding of excessive force, then the defendants are not entitled to summary judgment. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

1.      Nature of the Intrusion

First, the Court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (2011) (internal citation and quotation marks omitted). Tabak used a beanbag shotgun, which is "a twelve-gauge shotgun loaded with ... 'beanbag' round[s]," consisting of "lead shot contained in a cloth sack." *Deorle v. Rutherford*, 272 F.3d 1272, 1277 (2001). This is a use of force "designed to knock down a target, rendering the individual incapable of resistance, without (in the normal course of deployment) resulting in death." *Id.* at 1280; *Glenn*, 673 F.3d at 871 (a beanbag shot is "intended to induce compliance by causing

9

1   sudden, debilitating, localized pain, similar to a hard punch or baton strike"). "Although bean bag

2   guns are not designed to cause serious injury or death, a bean bag gun is considered a 'less-lethal'

3   weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or

4   death if they hit a relatively sensitive area of the body, such as [the] eyes, throat, temple or groin."

5   *Id.* (internal quotation marks omitted); *Deorle*, 272 F.3d at 1279 ("The force applied through use

6   of the cloth-cased shot can kill a person if it strikes his head or the left side of his chest at a range

7   of under fifty feet.").

8        Nonetheless, "the cloth-cased shot falls short of deadly force as defined in this circuit: 'that

9   force which is reasonably likely to cause death'" because the shot is not like a regular bullet—it

10  does not normally rip through soft tissue and bone on contact with the human body." *Deorle*, 272

11  F.3d at 1280.  Less-lethal launchers, like the one used here, "though less than deadly, [are] not to

12  be deployed lightly:" their use is permissible only when a "strong governmental interest compels

13  the employment of such force." *Id.*

14       2.    <u>Governmental Interests</u>

15       Courts evaluate the government's interest in using force by examining three central factors:

16  (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the

17  officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by

18  flight.  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citing *Graham*).  The Ninth

19  Circuit recognizes that "any other exigent circumstances that existed at the time of the arrest"

20  should also be considered.  *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198-

21  99 (9th Cir. 2000).  Ninth Circuit Model Civil Jury Instruction 9.25 mentions additional factors,

22  including: (4) the decision-making time constraints of a changing situation; (5) the type and

23  amount of force used; (6) alternative available methods of taking a suspect into custody; (7)

24  whether it was practical to warn of the imminent use of force; and (8) whether it should have been

25  apparent to the officer that the person was emotionally disturbed.  *See* Ninth Circuit Model Civil

26  Jury Instruction 9.25; *Chew*, 27 F.3d at 1440–1441 & n.5.

27       a.    <u>Severity of the Crime</u>

28       "The character of the offense is often an important consideration in determining whether

United States District Court
Northern District of California

10

1  the use of force was justified." *Deorle*, 272 F.3d at 1280.  Here, prior to using the less-lethal

2  launcher for the first time, Tabak had been informed that Plaintiff was suspected of occupying a

3  stolen vehicle, that Plaintiff was uncooperative when CHP officers attempted to apprehend him at

4  the vehicle, and that Plaintiff was attempting to evade CHP officers by fleeing his vehicle, running

5  down an embankment, and was running from officers in a dark and muddy private property in the

6  midst of heavy rain.  *See* Tabak Depo. at 61-63.  Based on this information, prior to using the less-

7  lethal launcher the first time, Tabak had a reasonable basis to believe that Plaintiff had driven a

8  stolen vehicle, a felony offense under California law.  *See* Cal. Veh. Code § 10851(a).  Tabak also

9  had a reasonable basis to believe that Plaintiff had committed misdemeanor offenses of resisting

10  arrest, Cal. Pen. Code § 148(a)(1), and trespass, Cal. Pen. Code § 602.

11         None of these offenses were violent crimes, and thus weighs against Defendants with

12  respect to the governmental interests at stake.  *See e.g., Chew*, 27 F.3d at 1442 ("A wide variety of

13  crimes, many of them nonviolent, are classified as felonies. . . The existence of three warrants for

14  undetermined crimes—for which Chew had not been tried or convicted—is thus not strong

15  justification for the use of dangerous force.").  Indeed, Plaintiff was ultimately charged with

16  misdemeanor offenses for driving under the influence, hit-and-run driving, and resisting arrest.

17  *See* Docket No. 54, Ex. B ("Crim. Complaint").  And all charges were ultimately dismissed.  *See*

18  Opp. at 14 n.1.

19                  b.   <u>Immediate Threat to the Officers' Safety</u>

20         "The most important factor under *Graham* is whether the suspect posed an immediate

21  threat to the safety of the officers or others."  *See Bryan*, 630 F.3d at 826.  Here, Tabak argues

22  that, considering the totality of the circumstances, Plaintiff posed an immediate threat to the safety

23  of the officers.  The summary judgment record indicates that prior to Tabak's use of the less-lethal

24  launcher, Plaintiff had evaded the attempts of CHP officers to arrest him, slid down a 150-foot

25  embankment, hid from officers in a dark, muddy expanse of private property, repeatedly refused to

26  obey commands to accede to his arrest, and continuously walked or ran away from officers

27  seeking to effect his arrest.  It is also undisputed that after Tabak struck Plaintiff in the arm with

28  the first less-lethal round, a woman yelled, "He's got a gun."  Tabak fired another less-lethal round

United States District Court
Northern District of California

11

1    at that time, which struck Plaintiff in the head.  Defendants argue that Plaintiff's conduct, taken

2    together, demonstrated that he posed an immediate threat to the safety of officers.

3          However, the undisputed facts in the summary judgment record also indicate that Plaintiff

4    never verbally threatened any officers, never physically threatened any officers, did not charge at

5    officers, and consistently walked or ran away from officers, or otherwise stood still or prone on the

6    ground.  *See* Tabak Depo. at 87:14-89:13.  Although Tabak heard a woman exclaim that "He has a

7    gun," Tabak never saw a weapon and never witnessed Plaintiff point anything at him that

8    resembled a weapon.  *Id.* at 87:14-19.  Other than the exclamation by the then-unidentified

9    individual, whose location and proximity to Plaintiff was unknown, and who did not specifically

10   identify to whom she referred, there is no evidence in the summary judgment record suggesting or

11   indicating that Plaintiff had any or was previously suspected of having any weapons, let alone a

12   gun.

13         Furthermore, Tabak's statements that Plaintiff never made his hands visible and held his

14   hands close to his waistband, making Tabak fear for his safety, are not enough on their own to

15   establish an immediate threat to the safety of officers.  *Deorle*, 272 F.3d at 1281 ("A simple

16   statement by an officer that he fears for his safety or the safety of others is not enough; there must

17   be objective factors to justify such a concern.");  *Cruz v. City of Anaheim,* 765 F.3d 1076, 1079

18   (9th Cir. 2014) (A court "cannot simply accept what may be a self-serving account by the police

19   officer, it must also look at the circumstantial evidence that, if believed, would tend to discredit

20   the police officers' story, and consider whether this evidence could convince a jury that the

21   officers acted unreasonably.").  There is no objective evidence in the record corroborating Tabak's

22   assertion that Plaintiff held his hands near his waistband.  At most, Officer Harless, another officer

23   on the scene, testified that around this time, Plaintiff continued not to comply with commands to

24   stop moving and to put his hands in the air.  Docket No. 63, Exh. B at 34:12-16.  Officer Harless's

25   testimony that Plaintiff did not put his hands in the air as commanded does not expressly confirm

26   Officer Tabak's testimony that Plaintiff's hands were near his waistband.  Indeed, despite the

27   presence of numerous officers on the scene, there is no testimony from other officers or other

28   corroborating evidence that Plaintiff had his hands near his waistband.  While "judges should be

United States District Court
Northern District of California

12

cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation," *Ryburn v. Huff*, 565 U.S. 469, 477 (2012), the Court still has an independent obligation to look at the objective evidence and totality of the circumstances to assess the threat posed to officers. Here, although Plaintiff did not comply with requests to stop and put his hands in the air, in light of the circumstances that Plaintiff was never seen with a weapon, never threatened any officers (even when he evaded their attempts to arrest him at his vehicle), and that Plaintiff was moving slowly and *away* from officers, there is a disputed question of material fact as to whether Plaintiff posed an *immediate threat* to the safety of officers. *See e.g., Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994) ("It appears from the record that after fleeing Chew hid in the scrapyard for an hour and a half before Bunch released [a German Shepherd dog] in an effort to capture him. The defendants do not suggest that Chew engaged in any threatening behavior during this time, or that he did anything *other than hide quietly*. In light of these facts, a rational jury could easily find that Chew posed no *immediate* safety threat to anyone.") (emphasis added).

> c. Attempting to Evade Arrest

There is no dispute that Plaintiff was actively engaged in an attempt to evade arrest from the moment that CHP officers approached his vehicle throughout the duration of the encounter, including his repeated refusals to obey officer commands.

Plaintiff contends that he was not "knowingly" evading arrest, but even if this were taken to be true (the summary judgment record is mixed; at times Plaintiff states in his deposition that he was having flashbacks to his life in Cambodia, while at other points he acknowledges that he knew he was being pursued by police in the California who were attempting to arrest him), it is not relevant to the analysis here: the Fourth Amendment imposes an objective reasonableness test on what the officers saw and perceived, not Plaintiff's subjective belief.

Nonetheless, the summary judgment record indicates, to the extent that Plaintiff sought to evade arrest once officers who encountered him in the Club Moto field, he moved very slowly and showed signs of disorientation. *Cf. Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) ("To the extent that he physically resisted arrest, defendants acknowledge that it lasted for only a brief

United States District Court
Northern District of California

time.  Although Smith refused to place both his arms behind his back, he did not attack the officers or their dog.  In all, it does not appear that Smith's resistance was particularly bellicose or that he showed any signs of fleeing the area.").

### d.   Decision-Making Time Constraints

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97.  Defendants do not expressly advance an argument as to this factor, but contend that Plaintiff's flight, refusal to cooperate, and his "reaching towards his waistband during a tense, rapidly-evolving situation" exemplified the uncertainty and tension of the encounter.  But, again, the only evidence that Plaintiff was "reaching towards his waistband" comes from Tabak himself – there is no additional objective or corroborating circumstantial evidence that supports this assertion of fact despite the observations by multiple officers over the course of several minutes before Tabak shot Plaintiff for the first time.  *Deorle*, 272 F.3d at 1281; *Cruz,* 765 F.3d at 1079.  Thus, for purposes of summary judgment, the Court cannot assume there was a particular urgency based on the reported observation that Plaintiff reached for towards his waistband to deploying the less lethal weapon.

Moreover, it is undisputed that Plaintiff was in the view of officers for several minutes before Tabak decided to fire the less-lethal launcher at him for the first time, and that, during that time, Plaintiff consistently walked *away* from officers, did not threaten officers, and did not brandish any objects thought to be weapons.  There were multiple law enforcement officers on the scene making it highly unlikely that Plaintiff would escape.  A reasonable jury, then, could conclude that there was time to contain and subdue him.  In *Deorle*, the Ninth Circuit found excessive force where an officer "observed [Plaintiff] at close proximity for about five to ten minutes before shooting him" with a less-lethal weapon.  *Id.* at 1281.  The court explained that a "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."  *Id.  "*There must be other significant circumstances that warrant the use of such a degree of force at the time it is

14

1    used."  Although the undisputed fact that a woman alerted Tabak to the possibility of the presence

2    of a gun is a "significant circumstance" in assessing the decision-making time constraints as to

3    Tabak's third shot, *id.,* as discussed above, *supra* Discussion § A(2)(b), this fact alone is not

4    dispositive and must be considered in light of the surrounding circumstances which suggested that

5    Plaintiff did not possess a weapon.

6         Thus, here, the summary judgment record, construed in the light most favorable to

7    Plaintiff, does not indicate that the decision-making time constraints weighed strongly in Tabak's

8    favor.

9              e.    Type and Amount of Force Used

10        It is undisputed that Tabak used a less-lethal launcher to strike Plaintiff at least twice, on

11   his arm and in the back of his skull, with "beanbag rounds" from a distance of 30-40 feet.  In

12   *Deorle*, a case which both parties rely on, the Ninth Circuit remarked that, "This cloth-cased shot,

13   which is something akin to a rubber bullet, is defined as a 'long-range impact weapon.'"  *Id.* at

14   1279.  "It is fired from a 12–gauge shotgun, and calculated to stop 'people who are violent or

15   hostile and are threatening injury or death to themselves or others.'"  *Id.*  In *Deorle,* the court

16   observed that the record indicated that "the cloth-cased shot was potentially lethal at thirty feet and

17   could be lethal at distances up to fifty feet."  *Id.*; *see also id.* ("The force applied through use of

18   the cloth-cased shot can kill a person if it strikes his head or the left side of his chest at a range of

19   under fifty feet."); *id.* at 1280 ("the cloth-cased shot constitutes force which has the capability of

20   causing serious injury, and in some instances does so.").  Defendants do not contest this

21   characterization.  Indeed, the City's policy training manual is consistent with this understanding of

22   the consequences of the use of a less-lethal launcher targeted at the upper body.  Docket No. 57,

23   Exh. A § 308.9.2 ("[T]he need to immediately incapacitate the subject must be weighed against

24   the risk of causing serious injury or death.  The head and neck should not be intentionally targeted,

25   except when the officer reasonably believes the suspect poses an imminent threat of serious bodily

26   injury or death to the officer or others.").

27             f.    Alternative Means Available

28        Officers "need not avail themselves of the least intrusive means of responding to an

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott*

2    *v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  However, "police are 'required to consider [w]hat

3    other tactics if any were available,'" and if there were "clear, reasonable and less intrusive

4    alternatives" to the force employed, that "militate[s] against finding [the] use of force reasonable."

5    *Glenn*, 673 F.3d at 876 (citation omitted); *see also Smith*, 394 F.3d at 703 (considering

6    "alternative techniques available for subduing him that presented a lesser threat of death or serious

7    injury").

8         Tabak argues that his options were limited: warnings had no effect, a police K-9 unit was

9    not available, and a Taser, baton, or pepper spray would have been ineffective based on his

10   distance from Plaintiff.  Mot. at 27.  In Tabak's view, he had two options – approach Plaintiff and

11   attempt to detain him with his hands, or use the less-lethal launcher.  Tabak argues it would have

12   been too dangerous to try the former, in light of Plaintiff's clear efforts to evade arrest, so Tabak

13   was left with only one safe option: to use the less-lethal launcher.  *Id.*

14        Tabak's arguments, however, omit important context.  According to CHP Officer Harless,

15   Plaintiff was pursued and encountered by approximately ten police officers in a secluded and

16   fenced-in field.  Docket No. 63 at 85, 100-101.  The summary judgment record indicates that

17   although Plaintiff repeatedly declined to comply with the officers' verbal commands, he never

18   approached the officers, consistently walked or otherwise moved slowly *away* from officers in a

19   manner that indicated Plaintiff's disorientation (at one point, evidence suggests that Plaintiff

20   walked into a fence and bounced off of it), and never displayed any weapons.  Thus, "the situation

21   here was far from that of a lone police officer suddenly confronted by a dangerous armed felon

22   threatening immediate violence."  *Deorle,* 272 F. 3d. at 1283.  As already noted, Tabak's desire to

23   resolve a potentially dangerous situation quickly is not sufficient, on its own, to justify the use of

24   force that may cause serious injury.  *Id.* at 1281.

25        Moreover, Tabak's proposed binary set of choices – either engage Plaintiff by hand or

26   shoot him with a less-lethal launcher – is not an undisputed fact supported by the summary

27   judgment record.  In light of the fact that ten officers pursued Plaintiff, who showed no ability to

28   move quickly nor any signs of aggression, it cannot be concluded on this summary judgment

16

1  motion that these were the *only* options available to Tabak and the other officers to effect

2  Plaintiff's arrest.  And even assuming Tabak was justified in using the less-lethal bean bag

3  launcher, there is a disputed question of fact as to whether Tabak's decision to aim his third round

4  at Plaintiff's *back* near his head from a distance of 30-40 feet was appropriate, in light of case law

5  establishing that the use of a less-lethal launcher at less than 50 feet can be potentially lethal.  A

6  reasonable jury could rely upon such evidence to find in favor of Plaintiff in assessing whether the

7  Tabak's use of force was unreasonable.

8              g.    Warnings

9        "[W]arnings should be given, when feasible, if the use of force may result in serious

10  injury, and that the giving of a warning or the failure to do so is a factor to be considered in

11  applying the *Graham* balancing test."  *Deorle*, 272 F.3d at 1284.  Here it is undisputed that

12  officers shouted numerous warnings to Plaintiff to comply over the course of several minutes

13  while they pursued Plaintiff in the Club Moto field up until the moments that Plaintiff was struck

14  with Tabak's less-lethal projectiles and was arrested.  Plaintiff argues that he did not hear the

15  warnings and that Tabak did not personally issue a warning, but the objective evidence—bodycam

16  footage—clearly demonstrates that multiple officers gave Plaintiff multiple warnings, repeatedly,

17  over the course of several minutes.  Plaintiff's own civil complaint against witness Welty also

18  concedes that he repeatedly refused to obey officer warnings.[4]

19        Still, Plaintiff's erratic responses to Defendants' warnings may be considered in the

20  *Graham* analysis.  *See Glenn*, 673 F.3d at 876 ("It appears that the only warning given

21  immediately before the beanbag shotgun was fired was when Pastore yelled 'beanbag, beanbag.'

22  Possibly, Lukus did not know what this statement meant, or perhaps even what a beanbag shotgun

23  was.  The officers concede that after being hit with the beanbag rounds Lukus 'appeared surprised,

24  confused, and possibly in pain,' and Lukus may even have thought he was being shot at with live

25  ────────────────

26  [4] Tabak also argues that the warnings were shouted to Plaintiff while they had their guns drawn,
    implying to him the consequences of his decision to fail to obey the warnings.  *See Hill v. Bay*
27  *Area Rapid Transit Dist.*, 2013 WL 5272957, at *6 (N.D. Cal. Sept. 18, 2013).  But given the
    darkness of the scene and the evidence in the record indicating that Plaintiff consistently turned
28  away from officers, the Court draws the reasonable inference in Plaintiff's favor that he could not
    see that guns were drawn and pointed at him.

United States District Court
Northern District of California

1   lethal rounds given the officers' previous threats of deadly force.  Confusion regarding whether his

2   life was in immediate danger may have led Lukus to seek cover rather than surrender.").

3           h.     <u>Mental Illness</u>

4        "In the case of mentally unbalanced persons, the use of officers and others trained in the art

5   of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a

6   crisis." *Id.* at 1283.  The Ninth Circuit emphasized that "where it is or should be apparent to the

7   officers that the individual involved is emotionally disturbed, that is a factor that must be

8   considered in determining, under *Graham*, the reasonableness of the force employed." *Id.*

9        Here, Plaintiff argues that Tabak should have been aware of Plaintiff's emotionally

10  disturbed by Plaintiff's confused behavior, including slow walking away from officers, walking

11  into a fence, and being unable to engage verbally with officers.  Construing the evidence in the

12  light most favorable to Plaintiff, a reasonable jury could conclude that these facts rise to the level

13  of making "apparent to the officers" that Plaintiff was emotionally disturbed.  *Cf. Alexander v.*

14  *City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994) (holding that the police

15  used excessive force, considering all the circumstances, in "storm[ing] the house of a man whom

16  they *knew* to be a mentally ill. . . recluse who had threatened to shoot anybody who entered")

17  (emphasis added).

18          3.    <u>Weighing the Interests</u>

19       Whether Tabak's use of the less-lethal launcher to strike Plaintiff at least two times,

20  including in the back of the skull, was objectively reasonable requires the Court to consider

21  whether the degree of force used was warranted by the governmental interests at stake.  The fact

22  that Plaintiff was actively attempting to evade arrest and repeatedly declined to obey warnings,

23  weigh in Tabak's favor.

24       However, as discussed above, construing the summary judgment record in the light most

25  favorable to Plaintiff, the record does not indicate that Plaintiff was suspected of committing a

26  particularly serious or violent crime.  The record also reveals that there are material questions of

27  fact as to whether Tabak was under intense time-constraints when deciding whether to use the

28  less-lethal launcher, whether there were viable alternative means available to effect Plaintiff's

United States District Court
Northern District of California

1    arrest, and whether Plaintiff showed clear signs of mental disturbance.  The summary judgment

2    record also shows material questions of fact as to whether Plaintiff posed an immediate threat to

3    the officers' safety.  Whether Plaintiff posed an immediate threat to the safety of officers is the

4    most important *Graham* factor for consideration.  *See Bryan*, 630 F.3d at 826.  Although

5    presenting a close question, the summary judgment record presents a factual questions whether

6    Plaintiff posed an immediate threat.

7            Moreover, it is undisputed that Plaintiff was consistently facing *away* from officers, there

8    were no bystanders known to be in the area, Tabak never saw Plaintiff brandish a weapon or make

9    any threatening movements, gestures, or direct any threatening language against officers, that

10   Plaintiff's conduct was generally confused, disoriented and slow, and that Tabak's use of a less-

11   lethal launcher aimed at Plaintiff's back from a distance of 30-40 feet was known to pose a serious

12   risk of grave injury.  Each of these factors weighs against Tabak in the assessment of

13   governmental interests.

14           Thus, taken together, the summary judgment record viewed in Plaintiff's favor

15   demonstrates that the governmental interests do *not* weigh heavily in Tabak's favor, and thus does

16   not provide a do not a "strong government interest" to compel Tabak's use of force.  *Deorle*, 272

17   F.3d at 1280.  Accordingly, the Court cannot conclude that Tabak's use of force was reasonable as

18   a matter of law on this record.  Therefore, Defendant Tabak is not entitled to summary judgment

19   on the merits of Plaintiff's excessive force claim.

20   B.      Qualified Immunity: Excessive Force Under the Fourth Amendment (Defendant Tabak)

21           Tabak argues that even if the summary judgment record does not entitle him to summary

22   judgment on the merits of Plaintiff's excessive force claim, Tabak is nonetheless entitled to

23   summary judgment based on his qualified immunity from liability under § 1983 because Tabak's

24   conduct did not violate clearly established law.

25           Public officials are shielded from liability for civil damages unless a showing is made that

26   "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly

27   established at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)

28   (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A right is clearly established if, at the

United States District Court
Northern District of California

time of the challenged conduct, "every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (citations and quotations omitted); *Mena v. City of Simi Valley*, 226 F.3d 1031, 1036 (9th Cir. 2000) ("In deciding whether Defendants are entitled as a matter of law to qualified immunity, [the Court] must accept the facts in the light most favorable to the Plaintiffs and then determine whether, in light of clearly established principles governing the conduct in question, the officers objectively could have believed that their conduct was lawful.").

The burden is on Defendants to prove they are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir. 2005). However, Plaintiff bears the burden of showing that the rights allegedly violated were "clearly established." *Shafer v. Cnty. of Santa Barbara,* 868 F.3d 1110, 1118 (9th Cir. 2017). In evaluating Defendants' entitlement to qualified immunity as a matter of law, the Court assumes all factual disputes are resolved in plaintiff's favor and all reasonable inferences are drawn in plaintiff's favor. *See Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir.2011) (en banc).

### 1. Violation of Constitutional Right

As discussed above, *see supra* Discussion § A, the summary judgment record demonstrates that a reasonable jury could find that Tabak used excessive force in violation of the Fourth Amendment.

### 2. Clearly Established Law

Although it is a close call, Plaintiff has not satisfied his burden to show that Tabak's conduct violated "clearly established law."

Certain aspects of the law regarding Plaintiff's rights were settled when Tabak fired the less-lethal launcher in November 2015. Prior to that date, the Ninth Circuit had explained that "[a]lthough bean bag guns are not designed to cause serious injury or death, a bean bag gun is considered a 'less-lethal' weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death if they hit a relatively sensitive area of the body, such as [the] eyes, throat, temple or groin." *Glenn*, 673 F.3d at 871-72; *see id.* ("In *Deorle*, we observed that the euphemism 'beanbag' 'grossly underrates the dangerousness of this projectile,' which 'can kill a

20

person if it strikes his head or the left side of his chest at a range of under fifty feet.'").  The Ninth

Circuit has stated, "In light of this weapon's dangerous capabilities, '[s]uch force, though less than

deadly. . . is permissible only when a strong governmental interest compels the employment of

such force.'"  *Id.*  Indeed, as noted above, *see supra* Discussion § A, Plaintiff agrees that the

applicable legal framework to analyzing the reasonableness of Tabak's use of the less-lethal

launcher is the excessive force framework laid out by the Supreme Court in *Graham* and applied

by the Ninth Circuit to the use of less-lethal launchers in *Deorle*.  As the Ninth Circuit in *Deorle*

recognized, even when a less-lethal launcher is used from a range of as close as 30 feet (as here),

such that a significant risk of serious injury obtains, the key question is whether under the

framework of the traditional excessive force analysis there was a strong governmental interest

compelling the employment of such force.  *Deorle*, 272 F.3d at 1280-81.  Plaintiff does not argue

that a different legal framework, such as the framework for analyzing deadly force, applies here.

Therefore, the relevant question as to the second prong of the qualified immunity analysis is

whether it a reasonable officer could have concluded that there was a strong governmental interest

compelling the use of the less-lethal launcher.

   The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not

to define clearly established law at a high level of generality."  *al-Kidd*, 563 U.S. at 742.  "The

general proposition, for example, that an unreasonable search or seizure violates the Fourth

Amendment is of little help in determining whether the violative nature of particular conduct is

clearly established."  *Id.*  Thus, beyond the general explanation of law regarding the risks posed by

the use of a less-lethal launcher, Plaintiff primarily relies on two cases in support of his argument

that clearly established law prohibited Tabak's conduct under the circumstances here.

   First, in *Deorle*, the plaintiff's wife called the police after the plaintiff, Deorle, began

behaving erratically by screaming and banging on the walls of the house, consumed "a half-pint of

vodka and some Interferon, his prescribed medication," and became suicidal.  272 F.3d at 1276.

Deorle's wife and children left the house while an officer responded to the situation, and called 13

additional officers for backup.  *Id.*  The officers set up roadblocks on the street "to ensure that

Deorle had no avenue of escape," and awaited the arrival of a "Special Incident Response Team

and a team of negotiators" trained in conflict resolution.  *Id.*  Deorle was "verbally abusive" (he yelled at an officer that he would "kick his ass"), but "physically compliant and generally followed all the officers' instructions."  272 F.3d at 1276-77.  For example, Deorle retreated towards his house when officers "tested" him by making their police dog bark at him, Deorle dropped a wooden board at officers' command, and, although Deorle brandished a "hatchet at a police officer, he threw the hatchet way into a clump of trees when told to put it down."  *Id.*  Deorle remained "agitated and continued to roam on or about the property but well within the police roadblocks."  272 F.3d at 1277.  Over the course of thirty to forty minutes, officers observed Deorle and "did not see him touch, let alone attack anyone."  *Id.*  As some point during this time while Deorle was being observed, Deorle carried an "unloaded plastic crossbow in one hand and what may have been a can or a bottle of lighter fluid in the other" and started "shouting at officers."  *Id.*  An officer commanded Deorle to put down the crossbow, and Deorle "discarded it."  *Id.*  Thereafter, continued to walk around his property.  *Id.*

The defendant officer, who had been on the scene observing Deorle for 30-40 minutes, stationed himself adjacent to the property and waited until Deorle "reached a predetermined point" and then fired a beanbag round at Deorle, without providing any warning.  272 F.3d at 1278.  The officer did not ask Deorle to drop the bottle or can, nor did he order him to halt.  *Id.*  The beanbag round struck Deorle in the face, fractured his skull, caused the loss of his left eye, and embedded in his skull.  *Id.*  The team of negotiators was still en route at the time that the officer shot Deorle.  *Id.*  The Ninth Circuit held that the officer's use force of constituted a violation of Deorle's right to be free from unreasonable seizures under the Fourth Amendment's objectiveness reasonableness standard.  *Id.* at 1285.  The court commented, "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense."  *Id.* at 1282-83.

Second, in *Glenn*, the Ninth Circuit found that disputed facts precluded a grant of a summary judgment on an excessive force claim where a beanbag gun was used against a plaintiff who wielded a knife, was known to be suicidal and "very intoxicated," and where the plaintiff

"was not wanted for any crime."  673 F.3d at 872-74.  As relevant here, in that case, Lukus Glenn, a recent high-school graduate, returned to the home of his parents, where he lived, at 3:00 a.m., "agitated, intoxicated and intent on driving his motorcycle."  *Id.* at 867.  When his parents told him he could not ride the motorcycle, Glenn became angry and began to damage the household property.  *Id.*  When his parents and friends tried to calm him down, Glenn put a pocketknife to his neck and threatened to kill himself.  *Id.*  Glenn's parents called the police, informed them Glenn was suicidal and was holding a pocketknife to his neck.  *Id.*  When the first officer arrived to the scene, he had a clear an unobstructed view of Glenn and saw that "he was not in a physical altercation with anyone," was not "threatening anyone with the pocketknife or in any other way, and no one was trying to get away from him," but that Glenn was "holding to pocketknife to his own neck."  *Id.* at 868.  The officer, immediately upon arrival, aimed a semiautomatic pistol at Glenn and screamed commands including "drop the knife or I'm going to kill you."  *Id.*  The court observed that there were disputed facts as to whether Glenn heard or understood the commands due to his intoxication and that many people were yelling at once.  *Id.*  Two additional officers arrived to the scene, one carrying a taser and beanbag shotgun.  *Id.* at 869.  Glenn pleaded, "Tell them to stop screaming at me," *id.* at 877, but immediately upon arrival of the officer carrying the beanbag shotgun, the officer was ordered to fire.  The officer fired all six of the beanbag rounds at Glenn.  *Id.* at 869.  Based on these facts, the court reversed the district court's grant of summary judgment that the officers' conduct was reasonable as a matter of law and held that a reasonable jury *could* find the use of force unreasonable.  *Id.* at 878.

Tabak argues that neither *Deorle* or *Glenn* are sufficient to "clearly establish" that Tabak's conduct in the situation here was prohibited.  The Court agrees: the relevant facts underlying the determinations in *Deorle* and *Glenn* that the respective officers' use of force was unlawful are far from those at issue here.  The Court cannot conclude that those cases clearly established that the circumstances present here did *not* evince a strong governmental interest sufficient to warrant Tabak's use of the less-lethal launcher.

Significantly, unlike here, both cases involved circumstances in which police were called specifically to address circumstances related to a mental health crisis in which the individual was

23

identified to the officers as being suicidal and behaving erratically.  In neither case was the plaintiff suspected of a criminal act; in both cases, officers were called specifically and informed that they had been asked to respond to the respective plaintiff's mental distress.  Here, by contrast, officers initially encountered Plaintiff based on their suspicion that he was driving a stolen vehicle, and Plaintiff proceeded to evade arrest over an extended period of time, leading the officers on a protracted pursuit through rough terrain in order to apprehend him.  Indeed, Plaintiff here concedes that he was evading arrest for which the officers had probable cause.  At no point were the officers here expressly informed that Plaintiff was experiencing an emotional disturbance.

Moreover, unlike the officers in *Deorle* and *Glenn* who encountered the plaintiffs in static locations, outside the respective plaintiff's homes, in which the officers had clear and unobstructed views of the plaintiffs, and where the plaintiffs made no attempts to evade officers, here Officer Tabak encountered Plaintiff in the midst of an ongoing chase that began on the interstate, proceeded down a 150-foot embankment, and continued into muddy terrain on private property during a nighttime rainstorm.  The dynamics of the situation here significantly more volatile and evolving than in *Deorle*, where officers observed the plaintiff for 40 minutes without any incidents of violence, or in *Glenn*, where officers had clear views of the plaintiff and saw that he posed a threat to no one but himself but still chose to immediately escalate the situation.

Moreover, unlike here, in both *Deorle* and *Glenn* the plaintiffs complied, or at least responded, to the commands of officers.  In *Deorle*, the plaintiff repeatedly obeyed the commands of officers to retreat and drop whatever he was carrying.  And in *Glenn,* despite the officers' aggressive approach to immediately threaten to kill the plaintiff, the plaintiff attempted to engage the officers by pleading for them to stop yelling.  Those situations are unlike the one here where Plaintiff repeatedly disobeyed officer commands and sought to evade officers at every turn.  Unlike the plaintiffs in *Deorle* and *Glenn,* at no point did Plaintiff acknowledge the officers' commands nor make any efforts to comply or engage with any of the officers.  Instead, unlike the plaintiffs in those cases, Plaintiff consistently attempted to escape from the scene.

Most importantly, it is undisputed here that a witness yelled out that a gun was present.  Neither *Deorle* nor *Glenn* dealt with a situation in which police officers were alerted of the

possible presence of a firearm in the midst of an ongoing chase of a suspect.  The fact that Tabak was alerted to the possibility that Plaintiff possessed a gun, when assessed in light of the circumstances of Plaintiff's repeated and continued refusal to obey or respond to any commands by officers and Plaintiff's efforts to evade arrest, sharply distinguishes the scenario here from the circumstances in *Deorle* and *Glenn*.  Although, as noted above in discussing the substantive constitutional violation, the strength of the evidence of the alleged gun sighting was far from clear and compelling and was not free of doubt, it is undisputed that a call out was made and under the circumstances, a reasonable officer could have mistakenly but reasonably thought immediate action using a less-lethal weapon was warranted.  This undisputed fact, taken together with the surrounding context, is critical in distinguishing *Deorle* and *Glenn* and supporting the Court's conclusion that an officer could have reasonably determined that there was a "strong governmental interest" warranting the use of a less-lethal launcher.

　　　　While the Supreme Court has explained there is no need to cite a case directly on point, it has, nonetheless, "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("[S]pecificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (same); *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11–12 (2021) (same).  As discussed above, the circumstances of *Deorle* and *Glenn* are far from similar to those presented here to qualify as "clearly established law."  The complex dynamics at play in this case, where Plaintiff was evading arrest and officers were alerted to the possible presence of a firearm, does not qualify the situation here as an obvious case in which a violation would have been so clear to an officer even in the absence of  analogous case law.  *See Rivas-Villegas*, 142 S. Ct. at 7–8 ("[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (quotation marks and citation omitted);

25

1    *cf. Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (when "'the defendant ['s] conduct is so

2    patently violative of the constitutional right that reasonable officials would know without guidance

3    from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not

4    required to show that the law is clearly established.").

5         Thus, the Court finds that although Plaintiff has stated a  potential substantive Fourth

6    Amendment violation, he failed to establish that a reasonable office should have known the

7    deployment of the less-lethal weapon violated clearly established law under the circumstances.

8    *Shafer*, 868 F.3d at 1118.  Accordingly, the Court concludes that Tabak is entitled to qualified

9    immunity from liability on Plaintiff's § 1983 claim for excessive force in violation of Plaintiff's

10   Fourth Amendment right.

11   C.       Substantive Due Process (Defendant Tabak)

12        Plaintiff also raises a claim that Tabak's alleged excessive force violated Plaintiff's right to

13   substantive due process under the Fourteenth Amendment.  The parties agree that because Tabak

14   used force while plaintiff was actively evading arrest, the Plaintiff's substantive due process claim

15   must be analyzed under the "intent to harm" or "shocks the conscience" test.  *County of*

16   *Sacramento v. Lewis*, 523 U.S. 833, 854 (1998).  In a fast-paced situation in which actual

17   deliberation by the officer is not practical, "only a purpose to cause harm unrelated to the

18   legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience,

19   necessary for a due process violation."  *Lewis*, 523 U.S. at 836.  The Court must decide whether

20   there are sufficient facts to support a jury finding that Tabak had the very "purpose to harm"

21   Plaintiff.  *Id*. at 854.  This requires a showing that the conduct "shocked the conscience."  *Id*.  The

22   use of force is not conscience-shocking unless it is applied "maliciously and sadistically for the

23   very purpose of causing harm."  *Id*. at 852-53; *see also Porter v. Osborn*, 546 F.3d 1131, 1140

24   (9th Cir. 2008) ("'[i]t is the intent to inflict force beyond that which is required by a legitimate law

25   enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983....'")

26   (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 172 (3d Cir. 1999) (McKee, J.,

27   concurring)).

28        Here, the only evidence in the record that Plaintiff points to in support of his claim of

substantive due process violation by Tabak is that Tabak fired the less-lethal launcher aimed at Plaintiff back from a distance of less than 50 feet without personally providing Plaintiff with a warning, which Tabak knew or should have known would have caused serious injury.  *See* Opp. at 20-21.  These facts, do not, on their own and in light of the surrounding context, raise a triable fact as to whether Plaintiff had a purpose to harm Plaintiff.  The evidence demonstrates that Tabak was engaged as part of a collective police response to effectuate Plaintiff's arrest, during which multiple officers repeatedly issued warnings to Plaintiff to comply, which Plaintiff repeatedly refused to obey.  Tabak fired the less-lethal launcher initially at Plaintiff's arm in an attempt to gain compliance.  When Plaintiff continued to evade arrest, and after a third-party suggested that Plaintiff had a gun, Tabak used the less-lethal launcher again.  That there is a factual question as to whether Tabak's use of force was excessive in violation of the Fourth Amendment does not, absent more evidence, indicate that Tabak intended to harm Plaintiff.

Indeed, in *Lewis*, the Supreme Court held that a purely reactive decision to give chase evidenced no intention to "induce ... lawlessness, or to terrorize, cause harm, or kill."  *Lewis*, 523 U.S. at 855.  The undisputed evidence here supports the conclusion that Tabak's decision to fire the less-lethal launcher round which struck Plaintiff in the head was reactive to Tabak seeing Plaintiff continue evasion and non-compliance.  There is no evidence suggesting Tabak's purpose was done maliciously for the very purpose of causing harm to Plaintiff.

The Supreme Court left open the possibility that liability can still attach under *Lewis* where a plaintiff proves particularly objectionable conduct.  *See Davis*, 190 F.3d at 172–73 (McKee, J., concurring).  The Ninth Circuit expressly agreed with Judge McKee's concurring opinion in *Davis*, a Third Circuit police chase case, which reasons that where force against a suspect is meant only to "teach him a lesson" or to "get even" then "*Lewis* would not shield the officers from liability even though they were ultimately effectuating an arrest."  *Porter*, 546 F.3d at 1140.  But here, there is no evidence or any statements in the record that demonstrate that Tabak had any such ulterior motive.  *See Bingue v. Prunchak*,  (officer was "responding to an emergency" when he decided to apprehend suspect after hearing a radio dispatch that several police units were in pursuit of a stolen vehicle). 512 F.3d 1169, 1177 (9th Cir. 2008); *Moreland v. Las Vegas Police*

1    *Dep't*, 159 F.3d 365, 373 (9th Cir, 1998), (officers were responding to the extreme emergency of
2    public gunfire" and did not intend any harm unrelated to law enforcement objectives.).

3          Tabak is entitled to summary judgment on Plaintiff's § 1983 claim for violation of
4    substantive due process.

5    D.    Punitive Damages (Defendant Tabak)

6          Plaintiff seeks punitive damages against Defendant Tabak for his alleged use of excessive
7    force in violation of Section 1983.  However, because the Court concludes that Tabak is entitled to
8    summary judgment on both of Plaintiff's § 1983 theories – under the Fourth and Fourteenth
9    Amendments—there is no claim remaining upon which Plaintiff can obtain punitive damages.

10   E.    Integral Participants (Defendants Busavec and Harris)

11         Plaintiffs allege that Defendants Busavec and Harris are also liable for Tabak's alleged use
12   of excessive force in violation of the Fourth and Fourteenth Amendment because they were
13   integral participants in Tabak's use of force.  "An officer's liability under section 1983 is
14   predicated on his integral participation in the alleged violation." *Blankenhorn v. City of Orange*,
15   485 F.3d 463, 481, n. 12 (9th Cir. 2007) (citations omitted).  Such participation requires "some
16   fundamental involvement in the conduct that allegedly caused the violation." *Id*. (emphasis
17   added).  "Officers are not integral participants in a constitutional violation under § 1983 simply by
18   the virtue of being present at the scene of an alleged unlawful act; instead, integral participation
19   requires some fundamental involvement in the conduct that allegedly caused the violation."
20   *Monteilh v. Cty. of Los Angeles*, 820 F. Supp. 2d 1081 (C.D. Cal. 2011).  It is not enough that an
21   officer was a "mere bystander" in the allegedly unconstitutional act. *Garlick v. Cty. of Kern*, 167
22   F. Supp. 3d 1117, 1160 (E.D. Cal. 2016).

23         The record here does not contain evidence sufficient to raise a triable fact as to Busavec
24   and Harris's integral participation in Tabak's alleged use of force.  Additionally, because Tabak is
25   entitled to summary judgment on Plaintiff's claims of violation of both the Fourth and Fourteenth
26   Amendment, so too are Defendants Busavec and Harris.

27         1.    Defendant Michael Busavec

28         The summary judgment record shows that shortly after arriving to the Club Moto property

United States District Court
Northern District of California

28

1    Defendant Livermore Police Officer Busavec slipped in the mud, suffered a broken fibula, and

2    was pulled to safety away from the scene where Plaintiff was struck by the less-lethal launcher

3    rounds.  Plaintiff argues that Busavec, nonetheless, was an "integral participant" in Tabak's use of

4    force because (1) Tabak used Busavec's less-lethal launcher to strike Plaintiff, and (2) "it appears

5    Busavec and Tabak formed the plan to use the less lethal shotgun against [Plaintiff] before

6    Busavec hurt himself and handed the shotgun to Tabak, who carried out the plan.  Opp. at 24-25.

7    Plaintiff's arguments lack both legal support and evidentiary support.

8        First, the fact that Tabak used Busavec's weapon does not, on its own, show that Busavec

9    had "some fundamental involvement in the conduct that allegedly caused the violation."

10    *Blankenhorn*, 485 F.3d at 481.  Plaintiff cites no case holding an officer who prepares or is

11    assigned a weapon that is used by another officer is necessarily liable as an integral participant.

12    Such a rule would have the effect of rendering any officer in the chain of custody of a weapon an

13    "integral participant" regardless of the officer's knowledge of how the weapon was used, and

14    would render meaningless the requirement to show "fundamental involvement."  Second, there is

15    *no evidentiary support* for Plaintiff's assertion that Busavec and Tabak planned to use the less-

16    lethal launcher against Plaintiff, particularly when and how he did, before Busavec hurt himself.

17    Plaintiff does not cite anything in the record to support this bare assertion.  *See* Opp. at 24-25.

18        At most, the record discloses Busavec was a "mere bystander" to Tabak's allegedly

19    unlawful conduct.  Busavec was not an integral participant and is entitled to summary judgment as

20    to all claims.  *See Garlick*, 167 F. Supp. 3d at 1160.

21        2.    <u>Defendant Michael Harris</u>

22        It is undisputed that Defendant Michael Harris was Chief of Police of the Livermore Police

23    Department and was not present at the scene of the incident.  Opp. at 25.  Plaintiff cites

24    *Blankenhorn* for the proposition that Harris may be subject to supervisorial liability in his

25    individual capacity "for his own culpable action or inaction in the training, supervision, or control

26    of his subordinates; for his acquiescence in the constitutional deprivation[;] or for conduct that

27    showed a reckless or callous indifference to the rights of others."  485 F.3d at 485 (quotation

28    marks and citation omitted).  But, as *Blankenhorn* further explains, and officers' supervisorial

United States District Court
Northern District of California

29

1    liability "depends upon whether he 'set in motion a series of acts by others, or knowingly refused

2    to terminate a series of acts by others, which he knew or reasonably should have known, would

3    cause others to inflict the constitutional injury.'"  *Id.* (citation omitted).

4          Here, there is no evidence in the summary judgment record demonstrating that Harris

5    engaged in acts or omissions, or knowingly refused to terminate a series of acts by others that

6    caused Plaintiff's alleged constitutional injury.  *Id.*  Plaintiff cites generally to the fact that Harris,

7    as police chief, was ultimately responsive for the training of officers, including Tabak.  But while

8    this observation may be true, *nothing* in the record specifically links Harris to any specific

9    "culpable action or inaction in the training, supervision or control of" Tabak.  *Id.*  The mere fact of

10   Harris's theoretical supervisory powers is not enough to establish liability.  *City of Canton, Ohio*

11   *v. Harris*, 489 U.S. 378, 385 (1989) ("In *Monell v. New York City Dept. of Social Services*, 436

12   U.S. 658 (1978), we decided that a municipality can be found liable under § 1983 only where the

13   municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious

14   liability will not attach under § 1983.").  Indeed, Plaintiff's expert on police practices and training,

15   Rahn L. Carmichael, does not mention any action or inaction by Harris in his expert declaration.

16   *See* Carmichael Decl.  Carmichael does not specifically mention Harris at all.

17         Thus, based on the summary judgment record, Harris was not an integral participant, nor is

18   he subject to supervisorial liability.  Thus, Harris is entitled to summary judgment as to all claims.

19   F.    Doe Defendants

20         The Ninth Circuit has stated that "as a general rule, the use of 'John Doe' to identify a

21   defendant is not favored." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (citing *Wiltsie v.*

22   *California Department of Corrections*, 406 F.2d 515, 518 (9th Cir. 1968)).  "However, situations

23   arise, such as the present, where the identity of alleged defendants will not be known prior to the

24   filing of a complaint.  In such circumstances, the plaintiff should be given an opportunity through

25   discovery to identify the unknown defendants, unless it is clear that discovery would not uncover

26   the identities, or that the complaint would be dismissed on other grounds." *Id.* (citations omitted).

27         Here Plaintiff filed this action on November 2, 2017 and named 20 Doe Defendants.  *See*

28   Compl.  The parties have engaged in discovery, with the deadline for fact discovery recently

United States District Court
Northern District of California

1   extended to July 18, 2022.  *See* Docket No. 60.  To date, Plaintiff has not amended nor sought

2   leave to amend the complaint to add additional Defendants.  Plaintiff does not explain in his

3   opposition whether he expects to name any additional defendants, or what additional discovery is

4   pending that would help to identify any other defendants.

5       Given Plaintiffs failure to identify any pending discovery that is likely to identify any other

6   defendants, the Court dismisses the Doe Defendants.

7   G.   *Monell* Liability

8       Plaintiff's second cause of action is for *Monell* liability based on the City of Livermore's

9   alleged failure to train Officer Tabak.  *See* Compl.; Opp. at 26.  "[A] city may be held liable under

10  section 1983 if its deliberate policy caused the constitutional violation alleged."  *Blankenhorn,* 485

11  F. 3d at 484 (citing *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 694 (1978).

12  "Because the policy [plaintiff] complains of is a failure to train, he must show that (1) he was

13  deprived of a constitutional right, (2) the City had a training policy that 'amounts to deliberate

14  indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely

15  to come into contact'; and (3) his constitutional injury would have been avoided had the City

16  properly trained those officers."  *Id.* (citation omitted).

17      As an initial matter, *Monell* provides a cause of action for liability against a municipality –

18  not against individuals.  *Id.*  Thus, Plaintiff has improperly asserted his *Monell* claims against all

19  Defendants, including individual defendants.  All individual defendants are entitled to summary

20  judgment on the *Monell* claim.

21      Next, as to *Monell* liability for the City of Livermore, the summary judgment record fails

22  to raise any triable issues of fact as to Plaintiff's failure to train claim.  As an initial matter,

23  Plaintiff's argument in support of his *Monell* claims amounts to a conclusory paragraph which

24  merely restates the legal elements of the claim.  Opp. at 26.  Beyond Plaintiff's cursory argument,

25  the only evidentiary support for Plaintiff's *Monell* claim is the declaration of retired police officer

26  Rahn Carmichael.  Carmichael declares that he reviewed the City's use of force policy, the police

27  department training policy, and the police department control devices and techniques policy.

28  Carmichael Decl., Introduction ¶ 20.  Carmichael does not identify any policies that he believes

United States District Court
Northern District of California

31

1    were lacking, and does not discuss the training records of any of the officers who are alleged to

2    have committed misconduct here.  Nor does Carmichael identify how the City was deliberately

3    indifferent to Plaintiff's constitutional rights, or what the City should have done differently with

4    regards to its training policies.  At most, the Court can extrapolate a potential deficiency in the

5    City's policies from Carmichael's comments that, based on his "review of the Force Policy for the

6    use of Less Lethal Weapons such as the Bean Bag Shotgun there was no mention as to the level of

7    skills needed to maintain proficiency with the weapon." *Id.* ¶ 17.  In Carmichael's opinion, "the

8    skills necessary to properly and safely deploy [less-lethal weapons] must be practiced in real world

9    scenarios quarterly." *Id.*  "Extreme care should be taken in the use of this weapon and proper

10   guidelines put into place to ensure proper use." *Id.*

11       The implication of this assertion is that the City *should* have required its officers, including

12   Tabak, to practice using bean-bag shotguns on a quarterly basis.  But Carmichael does not cite *any*

13   basis for this opinion.  Under Federal Rule of Evidence 702,[5] in analyzing purported *expert*

14   opinions, the Court must perform "a preliminary assessment of whether the reasoning or

15   methodology underlying the testimony is scientifically valid and of whether that reasoning or

16   methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. 579, 592–93

17   (1993).  "[E]xpert's opinions that are without factual basis and are based on speculation or

18   conjecture are inadmissible at trial and are inappropriate material for consideration on a motion for

19   summary judgment." *California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1181 (9th Cir.

20   2010).

21       Here, Carmichael does not reference any other jurisdiction that adopts such a quarterly-

22   training policy, or any training manuals, guidance documents, or best practice recommendations

23   issued by third-parties, such as POST, to provide support for his view that quarterly training is

24   required.  Even assuming Carmichael is qualified as an expert based on his experience and

25   _____

26   [5] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education
     may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other
27   specialized knowledge will help the trier of fact to understand the evidence or to determine a fact
     in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of
28   reliable principles and methods; and (d) the expert has reliably applied the principles and methods
     to the facts of the case." Fed. R. Evid. 702.

United States District Court
Northern District of California

training, there is no basis to credit his specific assertion of the necessity of a quarterly training requirement as an expert opinion because it lacks a factual basis and Carmichael does not explain any methodology or technique he used to arrive at his opinion.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Even if the Court were not to exclude Carmichael's opinion under *Daubert* and his opinion that "the skills necessary to properly and safely deploy [less-lethal weapons] must be practiced in real world scenarios quarterly," Carmichael Decl. ¶ 17, this assertion, standing alone, is insufficient to raise a genuine dispute of fact.  To support Plaintiff's *Monell* claim, there must be evidence that the City "disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights."  *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citing *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011)).  "A 'pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,' though there exists a 'narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference.'"  *Id.* (quoting *Connick,* 131 S.Ct. at 1360-61).  Here, there is no evidence in the summary judgment record that the City knew that omission of a *specific quarterly training requirement* for officers on the use of lethal-lethal launchers would cause its employees to violate the constitutional rights of citizens.  Moreover, Plaintiff does not evidence any evidence of "similar constitutional violations by untrained employees" of the City.  *Id.*

Nor does Plaintiff's failure to train claim fall within the "narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference."  *Connick*, 131 S. Ct. at 1361 (internal citations omitted).  In *City of Canton*, the Supreme Court "posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."  *Id.* at 1361 (internal citations and quotation

United States District Court
Northern District of California

1   marks omitted).  In its hypothetical, the Court "sought not to foreclose the possibility, however

2   rare, that the unconstitutional consequences of failing to train could be so patently obvious that a

3   city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Id.*  The

4   alleged omitted policy here – a quarterly training requirement on the use of less-lethal launchers –

5   does not give rise to such "patently obvious" unconstitutional consequences.

6          Accordingly, the Court concludes that Carmichael's bare statement is not enough to raise a

7   triable issue of fact as to whether the City had a training policy regarding less-lethal weapons that

8   "amounts to deliberate indifference to the constitutional rights of persons with whom its police

9   officers are likely to come into contact," and whether Plaintiff's constitutional injury would have

10  been avoided had Officer Tabak been properly trained – specifically, if Tabak would not have shot

11  Plaintiff in the head had he practiced using the less-lethal launcher on a quarterly basis.  *See*

12  *Blankenhorn*, 485 F.3d at 484.  Thus, the Court concludes that the City of Livermore is entitled to

13  summary judgment on Plaintiff's *Monell* claim.

**IV.**     <u>**CONCLUSION**</u>

15         For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment

16  in its entirety.

17         This order disposes of Docket No. 53.  The Clerk of the Court is directed to enter judgment

18  for Defendants and to close this case.

20         **IT IS SO ORDERED**.

22  Dated: July 20, 2022

24  _____
    EDWARD M. CHEN
25  United States District Judge

34